UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
SANDRA BARKLEY,

                Plaintiff,

      -against-

OLYMPIA MORTGAGE CO., et al.,

                Defendants.
--------------------------------------------------------X
MARY LODGE,

                Plaintiff,

      -against-

UNITED HOMES, LLC, et al.,

                Defendants.
--------------------------------------------------------X
DEWITT MATHIS,

                Plaintiff,

      -against-

UNITED HOMES, LLC, et al.,

                Defendants.
--------------------------------------------------------X
RODNEY GIBBONS & SYLVIA GIBBONS,

                Plaintiffs,

      -against-

UNITED HOMES, LLC, et al.,

                Defendants.
--------------------------------------------------------X

**MEMORANDUM & ORDER**

04 CV 875 (RJD) (KAM)

05 CV 187 (RJD) (KAM)

05 CV 4386 (RJD) (KAM)

05 CV 5302 (RJD) (KAM)

```
-------------------------------------------------------X
MILES MCDALE & LISA MCDALE,

                        Plaintiffs,

        -against-
                                                    05 CV 5362 (RJD) (KAM)

UNITED HOMES, LLC, et al.,

                        Defendants.
-------------------------------------------------------X
CHARLENE WASHINGTON,

                        Plaintiff,

        -against-
                                                    05 CV 5679 (RJD) (KAM)

UNITED HOMES, LLC, et al.,

                        Defendants.
-------------------------------------------------------X
```

DEARIE, Chief Judge.

Plaintiffs, eight first-time homebuyers, bring suit against real estate companies, lenders, appraisers, and lawyers, claiming that defendants conspired to sell them over-valued, defective homes financed with predatory loans and targeted them because they are minorities. They allege that defendants discriminated against them in violation of federal anti-discrimination statutes, including the Fair Housing Act, 42 U.S.C. §§ 3604, 3605, and 42 U.S.C. §§ 1981, 1982, 1985. Plaintiffs also assert state-law claims of fraud, conspiracy to commit fraud, legal malpractice, and negligence, as well as violations of New York's consumer protection statute, New York General Business Law § 349, and state and local anti-discrimination statutes, including the New York State Human Rights Law, Executive Law § 296(5), and Title 8 of the New York City Administrative Code. Plaintiff Sandra Barkley has also alleged that her lender, Olympia

Mortgage Corporation, violated the federal Truth in Lending Act, 15 U.S.C. § 1601 et seq.

Defendants have filed eleven separate motions to dismiss pursuant to Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6). Except as noted below, defendants' motions are denied.

## BACKGROUND

The first three plaintiffs to file suits were Sandra Barkley, Mary Lodge, and Dewitt

Mathis. In September 2005, plaintiffs sought to consolidate these cases and join five additional

plaintiffs, Miles and Lisa McDale, Rodney and Sylvia Gibbons, and Charlene Washington.

While this motion was pending, the McDales and the Gibbonses filed separate complaints. In

November 2005, Magistrate Judge Kiyo A. Matsumoto ordered the complaints consolidated for

pre-trial purposes only. Following this ruling, Washington filed a separate complaint and

Barkley, Lodge, Mathis, the McDales, and the Gibbonses filed amended complaints. The

motions before the Court address these latest pleadings.


Allegations Common to All Plaintiffs

Plaintiffs claim that defendants were part of a fraudulent property-flipping scheme. They

allege that United Homes and its affiliated companies, the common defendants in all the

complaints, bought damaged properties at foreclosure auctions or estate sales. Compl. ¶ 31.[1]

United Homes then performed some cosmetic repairs and, shortly thereafter, sold the properties,

---

[1]
      The six complaints have parallel numbering systems for the common allegations. Accordingly, allegations appearing in all the complaints are cited as "Compl." and refer to the amended complaints of Barkley, Lodge, Mathis, the Gibbonses, and the McDales, as well as the complaint of Washington.

often at double the purchase price. Id. ¶¶ 31, 38-39. Plaintiffs allege that United Homes worked together with appraisers, mortgage lenders, and lawyers, who facilitated the sales by preparing significantly overvalued appraisals and originating loans and mortgages that were correspondingly inflated. Id. ¶¶ 32, 47. Finally, these mortgages were quickly sold at a premium in the secondary market or insured by the Fair Housing Administration, thus allowing lenders to collect at an inflated price if borrowers defaulted. Id. ¶ 2; Mathis Compl. ¶ 118; Gibbons Compl. ¶ 57.

Plaintiffs allege that defendants targeted persons of limited financial means and savvy who had never before purchased homes. Compl. ¶¶ 31, 34. They claim that United Homes reached out to such customers by billing itself as a "one-stop shop" for first-time homebuyers. Id. ¶ 34. According to the complaints, once these buyers signed on with United Homes, they were handed off to cooperating lenders and lawyers, who rushed the transactions to completion at breakneck speed so that plaintiffs had little time to seek independent advice. Id. ¶¶ 34-35.

Defendants did more than merely dupe unsuspecting consumers, according to plaintiffs. They contend that defendants exploited New York City's racially segregated housing market and engaged in "reverse redlining," the practice of intentionally extending credit to members of minority communities on unfair terms. Id. ¶ 221. Specifically, plaintiffs allege that United Homes concentrated its business in minority census tracts and targeted minorities for the alleged scam by creating advertisements that featured minority homebuyers and selectively running these ads in minority communities. Id. ¶¶ 36-37.

Plaintiffs allege that as a result of defendants' fraud, they are burdened by mortgages they cannot afford and are at risk of losing their homes.

<u>Sandra C. Barkley</u>

In the winter of 2002-03, after renting for many years, Sandra Barkley, a 47-year-old African-American woman, became interested in buying a home. Barkley Compl. ¶¶ 110-11. An acquaintance of hers, who was also African-American, referred her to United Homes, where she met with Shaun Caesar. <u>Id.</u> ¶ 111.

In early January 2003, Caesar showed Barkley a number of homes in predominantly minority neighborhoods, and she settled on one located at 557 Hancock Street in the Bedford-Stuyvesant section of Brooklyn. <u>Id.</u> ¶ 113. Barkley alleges that she asked about certain repairs that were needed and that Caesar assured her the repairs would be completed prior to closing. <u>Id.</u> When she asked Caesar about the price, he did not give her a figure, but assured her that she could afford it. At the time, she made approximately $2332 per month working for the New York City Housing Authority. <u>Id.</u> ¶ 114.

A couple of days later, Barkley met at United Homes with attorney Michael Cheatham, who explained that he would represent her at the closing. She was asked to provide a $4000 check for an initial down payment, and she gave the check to Cheatham. She alleges that Cheatham asked her to sign some papers but told her she "did not need to worry" about reading them. <u>Id.</u> ¶¶ 115-16. He also told her that, despite her relatively low monthly income, she would be able to afford the mortgage because she could rent the upstairs unit for $1600 per month. <u>Id.</u> ¶ 117. At around the same time, Barkley was contacted by an employee of Olympia Mortgage Corporation ("Olympia"), who asked her to fax various documents, including pay stubs and utility bills. <u>Id.</u> ¶ 119. On January 9, she faxed the requested documents. <u>Id.</u>

Barkley made an appointment to meet with a private attorney on January 14. Id. ¶ 120. On January 13, she got a call from United Homes telling her that the closing would be the next day. She alleges that she felt "she had no choice but to cancel the appointment with the private attorney and proceed with the closing." Id. Still, on the morning of January 14, she spoke to Cheatham and expressed her concerns about getting independent representation. Id. ¶ 121. Shortly afterward, she received a call from another attorney, Benjamin Turner, who said he would act as her counsel from then on. Id. ¶ 121. Later that day, she walked through the property and noticed that significant repairs were still needed. Id. ¶ 122. She subsequently recited the list of repairs to Turner. Id. ¶ 124.

Turner represented Barkley at the closing on the evening of January 14. Barkley alleges that he handed her numerous documents and that everyone rushed her to sign them right away because it was getting late. Id. ¶ 125. At the loan closing, she finally learned the purchase price of the home—$359,000—and that she was entering into two mortgages requiring monthly payments exceeding 70% of her income. Id. ¶¶ 127-28, 158. She alleges that she was so distraught that she tried to cancel the sale the next morning. Id. ¶ 138. When she contacted Turner about her misgivings, he told her he would get back to her, but he never did. Id. ¶¶ 139-40.

When Barkley moved in, she discovered that many of the promised repairs had not been made. Cabinets were missing and only one of five radiators in the rental unit was functioning. Id. ¶ 143. She contacted United Homes and, while the company ultimately sent plumbers and contractors to the home, the problems were never fully remedied. Id. ¶ 144. Barkley also contacted the New York Attorney General. Id. ¶ 146. Following her complaints, United Homes

asked Barkley to sign a "General Waiver and Release," which stated that United Homes had completed all the repairs and that she wished to withdraw the complaint she had filed with the Attorney General. She refused to sign the waiver. Id.

In the months following the closing, Barkley became so suspicious about the sale that she hired an appraiser. The re-appraisal, conducted on July 24, 2003, valued the property at nearly $100,000 less than the original appraisal by defendant Thomas Messina. Id. ¶¶ 147-49. Barkley alleges that Messina completed his appraisal prior to her mortgage application and obtained the inflated figure by, among other methods, misusing comparable properties, omitting the full sales history of the property, and improperly classifying rooms as bedrooms. Id. ¶¶ 73, 147.


Mary Lodge

Mary Lodge, a 68-year-old African-American woman, is a retired nurse's aide. Lodge contacted United Homes in November 2002 after seeing a United Homes advertisement. Although Lodge owned a home that she had inherited, she had no experience buying or financing a home. Lodge Compl. ¶¶ 110-11. At the United Homes offices, an employee told her the company would help her get a mortgage. Id. ¶ 112.

Another United Homes representative, Chris Webb, took Lodge to see three properties. She liked one located at 249 Halsey Street in the Bedford-Stuyvesant neighborhood of Brooklyn. Id. ¶ 113. Webb told her that she could rent out two units to help pay the monthly mortgage. Id. ¶ 114. At the time, she received approximately $400 per month in Social Security payments as well as temporary income from housing foster children. Id. ¶ 118.

7

Shortly thereafter, Webb told Lodge that if she wanted to buy the property she needed to come to the United Homes offices as soon as possible. She told him she wanted to think it over, but the next day she went to the United Homes offices and spoke to a United Homes salesperson. Id. ¶¶ 116-17. The salesperson told her to bring a check for $35,000 the following day. After delivering the check, she was sent "upstairs" to speak with attorney Michael Cheatham. Id. ¶¶ 119-20. Cheatham told her that he worked for United Homes, but that he represented the clients and would be in her "favor." Id. ¶ 121. He told her to return the next day with a check for an additional $5000, which she did. Id.

The closing took place on January 16, 2003. Lodge says that she first learned during the closing that she would have two mortgages, one of which required a balloon payment of over $36,000 after 15 years. Id. ¶¶ 124-25, 132. At this point, she told Cheatham that she wanted to "end it there," but he assured her that she could rent out two units for $1500 each and that United Homes would help her find tenants. Id. ¶¶ 127-28. She relented and completed the closing. Only afterward did she learn that she could collect rent legally on one unit. Id. ¶ 130. This meant that she had to cover the $2897.10 monthly payments on her two mortgages with her $400 Social Security check and rental income from one unit. Id. ¶ 133.

After moving in, Lodge discovered that the home was in disrepair. She pulled up the new carpeting and noticed that the floor was "rotten and full of holes." Id. ¶ 143. The basement also flooded when it rained, and there were other drainage problems. Id. ¶ 144.

An appraisal commissioned by plaintiff's counsel valued the home, which had been appraised by defendant Michael Gilbert at $420,000, at only $235,000 at the time of sale. Id. ¶¶

146-47. Gilbert's appraisal, which was conducted for Olympia, was dated before Lodge ever contacted United Homes. Id. ¶ 147.


Dewitt Mathis

Dewitt Mathis, a 37-year-old African-American man, works as a computer operator for a security company. In the late summer of 2002, Mathis, who had been living with his domestic partner, Karen Jenkins, and their children in a rental apartment, saw a United Homes ad in the *Daily News* and contacted the company. Mathis Compl. ¶¶ 110-12. A salesman named Oren showed Mathis and Jenkins two homes in predominantly minority neighborhoods. They liked the property located at 21 Marconi Place in the Brownsville section of Brooklyn, but it appeared to be under construction. Id. ¶ 113. Oren told them the property would be ready in a week and that all the necessary repairs would be completed. Id.

Back at the United Homes offices, Oren took down Mathis's income of approximately $2800 per month. At the time, Jenkins was unemployed. The couple was told that Jenkins's mother, who was living with the family, would have to "go on [the] title." Id. ¶¶ 114-15. United Homes also directed the family to Alliance Mortgage Banking Corporation ("Alliance"), which qualified the Mathis family for a mortgage with monthly payments of $2285.98. Id. ¶¶ 117-18. Oren informed Mathis that United Homes would also provide them with an attorney, Marios Sfantos. Id. ¶ 116. Mathis met Sfantos for the first time at the signing of the sale contract at the United Homes offices. Id. All subsequent meetings with Sfantos were at the United Homes offices. Id.

After moving in, Mathis discovered a host of problems. The backyard was filled with construction rubble, and there was a severe sewage back-up that caused flooding. The electrical wiring in the house was also improperly installed. Id. ¶¶ 128-30.

An appraisal commissioned by plaintiff's counsel valued the home, which Mathis had purchased for $325,000, at only $202,000 at the time of the sale. Id. ¶ 124. Mathis alleges that defendant Joseph D. Gaeta overstated the value of the renovations to the property and prepared an inflated appraisal. Id. ¶ 73.


Rodney and Sylvia Gibbons

Rodney and Sylvia Gibbons, 56 and 47 years old, immigrated to the United States from Barbados more than 25 years ago. He is a custodian at a day-care center and she is a school bus monitor. In 2002, the couple began talking about buying their first home and saw a United Homes billboard on Atlantic Avenue in Brooklyn advertising "dream homes." Gibbons Compl. ¶¶ 110-11. The couple first met with a United Homes manager, who was white. The manager introduced them to an African-American salesman, Barry Braxton. Id. ¶ 112. Braxton allegedly told the couple that he was a churchgoer and that he "takes care of 'his own.'" Id. ¶ 113.

Braxton showed the couple numerous homes located in predominantly minority neighborhoods. Id. ¶ 115. They liked a two-family home at 1148 Halsey Street in the Bushwick neighborhood of Brooklyn. He assured them that they could afford it by renting out the upstairs floor for $1600 per month. Id. At the time, they jointly made approximately $2500 per month. Id. ¶ 114.

Soon afterward, another United Homes employee told the couple that the company had a lawyer to represent them and introduced them to attorney Marios Sfantos, who was at the United Homes offices. Id. ¶ 116. Sfantos told the couple that United Homes had an inspector who could evaluate the property, but that "they could hire their own inspector." Id. ¶ 117. United Homes also arranged a meeting at its offices between the Gibbonses and a representative from Olympia, who told the couple that they would need to take on two mortgages. Id. ¶¶ 118-19. Plaintiffs further allege that Olympia deliberately inflated the couple's income and assets on the loan application. Id. ¶¶ 134-35.

At the closing, Ms. Gibbons expressed concern that the couple would not be able to afford the monthly mortgage payments. Braxton assured them that they would be able to afford the payments with the income from a tenant. Id. ¶ 123. Mr. Gibbons, however, continued to be anxious and grew so stressed that he suffered a heart attack during the closing and was taken to the hospital. Id. ¶ 124.

Following the aborted closing, Braxton continued to call Ms. Gibbons, telling her that the couple needed to close the deal because other offers were on the table. A week or two later, the couple agreed to a second closing. Id. ¶ 125. At the second closing, Ms. Gibbons again expressed concerns about the financing, especially since her husband was now out of work due to the heart attack. Id. ¶ 126. A United Homes manager told them that the company had reduced the price of the home by $10,000 and again reminded them of the rental income. Id. ¶ 127.

After moving in, the couple discovered that the radiators did not work well and that the home was infested with mice. Id. ¶¶ 144-45. Though Braxton promised to get them a tenant, it took him six months to do so. The tenant called the Department of Health about the mice and

11

stopped paying rent. Id. ¶¶ 148-50. When the couple evicted the tenant for non-payment, she threatened to burn down the house and kill Ms. Gibbons. Id. ¶ 151.

An appraisal commissioned by plaintiff's counsel valued the home, which plaintiffs had purchased for $359,000, at only $245,000 at the time of the sale. Id. ¶ 141. The Gibbonses allege that defendant Thomas Messina prepared an inflated appraisal on behalf of United Homes and Olympia. Id. ¶ 143.


Lisa and Miles McDale

Lisa and Miles McDale, 34 and 44 years old, are African-American. Mr. McDale works for the New York City Transit Authority. When the couple began house hunting in 2002, Ms. McDale worked in communications at Brookdale Hospital, and the two were planning to marry. McDale Compl. ¶¶ 110-11. Their combined income was approximately $3200 per month. Id. ¶ 115.

The couple had seen ads for United Homes featuring African-American families in the *Daily News* and on subways and buses. Id. ¶ 112. The McDales called United Homes in November 2002 and met with Robert Cadoch. Id. ¶ 113. A young black man then showed them a series of homes in Brownsville and Bedford-Stuyvesant, some of which were in serious disrepair. Id. ¶ 114. When Ms. McDale asked their escort about the company's customer base, he told her that it was "Puerto Ricans and blacks, but mostly blacks." Id. When the couple asked why he was showing them homes in Brownsville and Bedford-Stuyvesant, he "indicated that he believed United Homes was trying to sell the McDales a home in certain neighborhoods only." Id.

After several days of viewing houses, the same United Homes representative took them to 2126 Union Street in the Brownsville section of Brooklyn. There were no functioning lights, so he showed them the property by flashlight. Id. ¶ 117. The couple concluded that the house was a "crack house" and needed work, but they thought it would serve their needs. Id. ¶ 117. When they returned to United Homes the following day, they met with Cadoch and asked about buying the house "as is" and applying for public funds to restore it. Id. ¶ 118. Cadoch assured them that United Homes would fully rehabilitate the home. Id.

Cadoch then introduced the McDales to a man named Jerry, who congratulated them on qualifying for purchasing the home. When Jerry later told them the sales price—$385,000—he told them they "need not worry" because the property would generate $1700-$1900 in monthly rental income and he assured them that United Homes routinely found tenants for their purchasers. Id. ¶ 119.

After Jerry left, the McDales were introduced to a loan broker from Alliance, Mr. Israel. After learning that Mr. McDale paid $500 per month in child support, Mr. Israel consulted with Jerry and told the couple that they could only qualify for a "no doc" loan with an adjustable mortgage. Id. ¶¶ 120-23. Mr. Israel also instructed Mr. McDale to write a "shock letter" to accompany his mortgage application, explaining how the couple would handle the increase in their monthly expenses. Mr. McDale wrote that he intended to rely on the rental income. Id. ¶ 132.

Finally, Jerry told the couple that they needed an attorney. He explained that they could retain their own or use one provided by United Homes. Id. ¶ 125. Jerry then left the room, and "minutes later," attorney Benjamin Turner entered and introduced himself. Id. Turner told the

couple that they had the option of getting their own lawyer, but that he regularly worked with United Homes and would be sure that the house and deal were "up to par." Id.

Over the next two weeks, the McDales expressed reservations about the repairs needed at the home. Id. ¶ 126. Jerry told them that they could hire their own inspector, but that United Homes always commissioned an inspection. Id. They were introduced to the construction manager for the home, who assured them that 2126 Union Street was being completely gutted and rebuilt. Id. ¶ 127.

The McDales signed the contract on October 16, 2002. Over the next few weeks, the couple tried to gain access to the property, but United Homes personnel told them they could not enter because of the ongoing construction. Id. ¶¶ 128-29. When the McDales finally did a walk-through of the property ten days later, they found that United Homes had reconfigured the number of rooms and had failed to insulate the floors and windows. Id. ¶ 135.

At the closing, the McDales met attorney Raj Maddiwar, who told them he was an associate of Turner's. Id. ¶ 139. The McDales described more than a dozen problems with the renovations. Maddiwar wrote down a handful of the less serious problems but told the couple to leave the remaining ones to an oral "side agreement" with United Homes. Id. ¶ 141. Maddiwar also told the couple that the closing had to happen that day because the rates were going up. Id. ¶ 143. When Mr. McDale paused to read the documents, Maddiwar hurried him along. Id. ¶ 144.

Problems with the house surfaced soon after the McDales moved in. Id. The floors buckled, the electrical system was a fire hazard, and an upstairs toilet leaked into the room below. Id. ¶ 153. The couple contacted United Homes about the problems. Initially, Jerry said he would "redo the whole house," but later he offered to do the repairs for $5000. Id. ¶ 154. The

couple finally rented out the unit. Id. ¶ 152. However, they eventually had to ask the tenant to leave so they could repair the rental unit. Id. ¶ 155.

An appraisal commissioned by plaintiff's counsel valued the home, which the McDales purchased for $365,000, at only $220,000 at the time of the sale. Id. ¶¶ 149-50. The McDales allege that defendant Michael Masciale prepared an inflated appraisal. Id. ¶ 73.

Charlene Washington

Charlene Washington, 31, is an African-American woman employed at a bridal shop. A first-time homebuyer, Washington was referred to United Homes in late 2002 by an African-American member of her church, Robert Wright, who was in the real estate business. Washington Compl. ¶¶ 110-12. Wright told her that United Homes had an "interest in helping African-Americans acquire a home." Id. ¶ 112. Wright's statements were consistent with ads she had seen on the A train of the New York subway that typically featured an African-American couple. Id. ¶ 113. At the time, Washington worked as a live-in nanny and made $600 per week. Id. ¶ 131.

Wright arranged to meet Washington at the offices of United Homes. Id. ¶ 114. Wright showed her two homes. Because the electricity was not functioning, Wright showed her the homes by flashlight. Id. ¶ 116. Washington selected the second home, located at 2422 Dean Street in the Brownsville section of Brooklyn. Id. ¶ 117. Later that evening, she met with United Homes employee Robert Cadoch, who ran her credit report and told her that the company would "make the deal work financially." Id. ¶ 118.

15

Subsequently, Washington again met with Wright at the United Homes offices. He told her that she needed an attorney and that United Homes had worked with an attorney named Michael Cheatham. He also told her she could choose her own attorney. Id. ¶ 119. She agreed to use Cheatham, who shortly afterward "appeared" at the United Homes offices. Id. Cheatham told Washington that "they" needed a "good faith" deposit, and she gave him a check for $2000 payable to United Homes. Id.

United Homes also arranged for Washington to meet with a mortgage broker from Gateway Mortgage. Id. ¶ 120. At church, Robert Wright informed her that Gateway had not approved her and asked her to return to United Homes to meet with other lenders. Id. ¶ 121. Later, Wright asked her to return to the office a third time. A representative from Gateway was there once again and asked her to provide income and other information. She brought this information to Wright and, after this, a closing date was set. Id.

Before she closed on the house, Washington returned to the property during daylight hours. Id. ¶ 123. The house appeared to her to be in good condition. Id.

On January 13, 2003, Wright took Washington to the closing at the offices of United Homes. Cheatham briefly explained the documents and Washington signed them. Id. ¶ 125. Washington learned for the first time at the closing that she would have an adjustable-rate mortgage. Id. ¶ 127. Cheatham told her the mortgage had an adjustable rate of 4.5% and was a "great deal." Id. In fact, the loan had a rate that could climb as high as 9.5%. Id. ¶ 128.

Shortly after the closing, Washington experienced problems with her chimney that caused her furnace to shut down. During this period, she slept in the kitchen and used her oven for heat. Id. ¶ 137. Washington tried to contact United Homes about the problem. Id. After repeatedly

16

refusing to pay for the repairs and standing Washington up for appointments, the company finally did restore heat to the home. Id. However, Washington also discovered that she had a leaky basement and an infestation of mice. Id. ¶¶ 138, 140. After pulling back the carpet, she noticed more than 20 holes, some as big as her fist. Id. ¶ 140. In the fall of 2003, Washington hired an inspector, who determined that the property suffered from structural deficiencies, including cracks in the masonry and the foundation as well as a faulty drainage system. Id. ¶ 141.

An appraisal commissioned by plaintiff's counsel valued the home, which Washington had purchased for $315,000, at only $180,000 at the time of the sale. Id. ¶ 133. Washington alleges that Michael Masciale prepared a grossly inflated appraisal and that Joseph D. Gaeta prepared a "desk review" appraisal prior to closing that supported Masciale's appraisal. Id. ¶¶ 70-79.

## DISCUSSION

At the outset, it is worth noting that this is not a classic Rule 12 dispute. Plaintiffs have made clear what each defendant is alleged to have done (or not done) in the course of and in furtherance of the charged conspiracies, and no defendant contends that the pleadings fail to provide adequate notice. Plaintiffs allege that United Homes was in cahoots with corrupt mortgage lenders and appraisers, who tendered purposefully inflated property value assessments. They further allege that lawyers, who were supposed to offer protection and wise counsel to their clients, instead acted as point men for the conspiracies, facilitating the accelerated closings of unconscionable loans, all the while offering false assurances and parroting the conspiracies' company line. In sum, the allegations paint clear, consistent pictures of a carefully orchestrated

17

scheme that victimized minority homebuyers and saddled them with debt beyond their means to repay. Out of this extensive briefing, seasoned with protestation and hyperbole, two essential issues emerge. The first is whether plaintiffs have sufficiently pled race discrimination in violation of federal law. The second issue concerns whether the claims against individual defendants are pled with sufficient specificity.

## A. Standard for Motion to Dismiss

Under the pleading standard set forth in Federal Rule of Civil Procedure 8(a), complaints must include a "short and plain statement of the claim showing that the pleader is entitled to relief." Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). When deciding a motion to dismiss, the Court must "accept all factual allegations as true and draw all reasonable inferences in plaintiff's favor." Ofori-Tenkorang v. Am. Int'l Group, Inc., 460 F.3d 296, 298 (2d Cir. 2006).

The Supreme Court recently explained that in evaluating a motion to dismiss under Rule 12(b)(6), a district court must determine whether the "[f]actual allegations . . . raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007) (internal citations omitted). According to the Twombly Court, a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." Id. at 1974. The Second Circuit has stated that Twombly does not require a universally heightened standard of fact pleading under Rule 8, but "instead requir[es] a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such

amplification is needed to render the claim plausible." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007).

Although, in the Rule 12(b)(6) context, the Court is "normally required to look only to the allegations on the face of the complaint," it may also consider "[d]ocuments that are attached to the complaint or incorporated in it by reference . . . ." Roth v. Jennings, No. 06-0784-cv, 2007 U.S. App. LEXIS 13035, at *26 (2d Cir. June 6, 2007). "In addition, even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint*' may be considered by the court in ruling on such a motion." Id. at *26-27 (quoting Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991)) (emphasis in original). "And whatever documents may properly be considered in connection with the Rule 12(b)(6) motion, the bottom-line principle is that 'once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.'" Id. at *29 (quoting Twombly, 127 S. Ct. at 1969).

## B. Plaintiffs' Federal Race Discrimination Claims

Plaintiffs allege that defendants discriminated against them in violation of 42 U.S.C. §§ 1981, 1982, and 1985(3), and the Fair Housing Act, 42 U.S.C. §§ 3604, 3605. They assert these federal race discrimination claims against the following defendants: United Homes, LLC, and its affiliated companies United Property Group, LLC, and Galit Network, LLC; United Homes president Yaron Hershco; lenders Olympia Mortgage Corporation and Alliance Mortgage Banking Corporation; lawyers Benjamin Turner, Michael Cheatham, and Marios Sfantos; and appraisers Thomas Messina, Michael Gilbert, Michael Masciale, and Joseph D. Gaeta.

I.  Plaintiffs' Claims Under 42 U.S.C. §§ 1981, 1982, and 1985(3)

Sections 1981 and 1982 ban discrimination in various financial transactions, including

making and enforcing contracts and purchasing real and personal property.  42 U.S.C. §§ 1981,

1982.  To state a claim for relief under Sections 1981 and 1982, a complaint must allege:  (1) that

the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on

the basis of race; and (3) that the discrimination concerned one or more activities enumerated in

Section 1981 or Section 1982.  See Jones v. Nat'l Commc'n & Surveillance Networks, 409 F.

Supp. 2d 456, 470 (S.D.N.Y. 2006).

Section 1985(3) prohibits two or more persons from conspiring for the purpose of

depriving any person of the equal protection of the laws.  The four elements of a Section 1985(3)

claim are:  "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any

person or class of persons of equal protection of the laws, or of equal privileges and immunities

under the laws; [and] (3) an act in furtherance of the conspiracy; (4) whereby a person is either

injured in his person or property or deprived of any right of a citizen of the United States."  Mian

v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993) (per curiam).  A

conspiracy "need not be shown by proof of an explicit agreement but can be established by

showing that the 'parties have a tacit understanding to carry out the prohibited conduct.'"

Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999) (quoting LeBlanc-Sternberg v. Fletcher, 67

F.3d 412, 427 (2d Cir. 1995)).  Further, the conspiracy must be motivated "by some racial or

perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action."

Mian, 7 F.3d at 1087 (quoting United Bhd. of Carpenters, Local 610 v. Scott, 463 U.S. 825, 829

(1983)).

Defendants claim that plaintiffs have failed to allege discriminatory intent as required under Sections 1981, 1982, and 1985(3), and instead have made only conclusory assertions insufficient to withstand a motion to dismiss. The Court disagrees.

Plaintiffs have alleged specific conduct which, if proven at trial, could support an inference of intentional discrimination. The complaints outline a far-reaching conspiracy that touched every step of the home-buying process and depended for its success on the participation of every player in that process. Plaintiffs allege that the various actions constituting the fraud "were taken deliberately and with racially discriminatory intent." Compl. ¶ 231. Standing alone, this allegation might be too conclusory to allege intentional racial discrimination. However, plaintiffs describe how defendants conspired to target minorities as well as how they executed the fraudulent scheme.

For example, plaintiffs allege that United Homes used advertising featuring minority consumers. Id. ¶ 34. They also allege that the company placed ads in the *Carribean Life* community newspaper that serves the West Indian immigrant community, while not advertising in community papers that are part of the same newspaper chain but serve primarily white neighborhoods. Id. ¶ 36.

Another example of racial targeting is each plaintiff's claim that he or she was shown housing stock in minority neighborhoods only. When the McDales inquired why they were being shown houses in the Brownsville and Bedford-Stuyvesant sections of Brooklyn, a United Homes representative "indicated that he believed United Homes was trying to sell the McDales a home in certain neighborhoods only." McDale Compl. ¶ 114. When the McDales asked about the

company's customer base, the representative told them it was made up of "Puerto Ricans and blacks, mostly blacks." Id.

Finally, two plaintiffs allege that United Homes used race-conscious outreach strategies. The Gibbonses allege that defendants paired them with an African-American salesman, Barry Braxton, who told them he "takes care of 'his own.'" Gibbons Compl. ¶¶ 112-13. In the same vein, Washington alleges that a fellow churchgoer and African-American recruited her to United Homes, telling her that the firm had an "interest in helping African-Americans acquire a home," and subsequently acted as a go-between by instructing her to return to United Homes for meetings with mortgage brokers. Washington Compl. ¶¶ 111-12, 121.

Taken together, these allegations permit the inference that defendants sought to lure minority homebuyers into the fraudulent transactions. The Court notes that in making such an inference, a factfinder might determine that defendants had harbored ill will toward racial minorities, *or* that they had used race as a proxy, doing business exclusively with minorities out of the biased perception that those individuals would be especially vulnerable to fraud. The second conclusion, no less than the first, would support a judgment for plaintiffs. Cf. Johnson v. California, 543 U.S. 499, 511 (2005) ("When government officials are permitted to use race as a proxy for gang membership and violence . . . society as a whole suffers."); Miller v. Johnson, 515 U.S. 900, 912 (1995) ("Race-based [voting] assignments embody stereotypes that treat individuals as the product of their race, evaluating their thoughts and efforts—their very worth as citizens—according to a criterion barred to the Government by history and the Constitution." (quotation marks omitted)); Powers v. Ohio, 499 U.S. 400, 410 (1991) ("Race cannot be a proxy for determining juror bias or competence.").

22

Several other district courts have acknowledged that evidence of targeting may establish discriminatory intent in housing discrimination cases. In Hargraves v. Capital City Mortgage Corporation, 140 F. Supp. 2d 7, 20-22 (D.D.C. 2000), the court denied defendants' summary judgment motion on plaintiffs' housing discrimination claim in a case involving predatory lending and looked to evidence of targeting to help establish discriminatory intent. In Hargraves, plaintiffs pointed to evidence that the defendant mortgage company located its offices in predominantly black communities, used brokers who operated in these communities, distributed flyers and advertisements in these same neighborhoods, and exhibited a photograph of famous black leaders standing with the company's president in an alleged "attempt to convey a message to African-Americans that [the president] could be trusted." Id. at 21-22. See also Matthews v. New Century Mortgage Corp., 185 F. Supp. 2d 874, 887 (S.D. Ohio 2002) (concluding that allegation that defendant had targeted single, elderly females for predatory loans was sufficient to withstand motion to dismiss); Honorable v. Easy Life Real Estate Sys., Inc., No. 97 C 6009, 1998 U.S. Dist. LEXIS 15872, at **16-18 (N.D. Ill. Sept. 30, 1998) (certifying class in Fair Housing Act case and relying, in part, on allegations that "defendants preyed on the plaintiff class by targeting their advertising to unsophisticated, first-time home buyers in the racially segregated Austin community, materially misrepresenting the condition and value of homes offered for sale . . .").

Defendants point to Wiltshire v. Dhanraj, 421 F. Supp. 2d 544 (E.D.N.Y. 2005), where the court granted a motion to dismiss in a case involving a similar scheme. Defendants' reliance on Wiltshire is misplaced. The 170-page amended complaint reviewed by the Wiltshire court did not contain a single allegation of intentional targeting. According to the Wiltshire court, the

allegations in the complaint "suggest[ed] that defendants sold defective homes to unsophisticated persons, regardless of their ethnicity, in order to perpetuate a fraud." Id. at 553. By contrast, the complaints against United Homes and the other defendants not only allege that plaintiffs were targeted for fraud because of their race, but also contain detailed allegations of defendants' efforts to accomplish this targeting through advertising and other modes of minority-focused outreach and race-sensitive recruiting.

Finally, United Homes and the participating lawyers, appraisers, and lenders contend that the Supreme Court's recent decision in Twombly is dispositive of plaintiffs' claims of race discrimination. However, nothing in Twombly changes the Court's view of the complaints in this case. As the Second Circuit explained in Iqbal v. Hasty, the Twombly Court "is not requiring a universal standard of heightened fact pleading, but is instead requiring a 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." 490 F.3d at 157-58. Here plaintiffs' allegations are more than adequate to render the complaints plausible as to each of the defendants. The complaints allege a scam to target minorities for fraudulent home sales that was all-encompassing and would not have succeeded but for the coordinated participation of the individual defendants. To be sure, the race-discrimination allegations against some of the participating lawyers, lenders, and appraisers are of a more generalized character. But read in the context of the pleadings as a whole, the complaints paint a clear picture of a carefully orchestrated, multi-player scheme in which the individual lawyers, lenders, and appraisers conspired at every step of the way to keep plaintiffs in the dark about the true terms of the deals they were entering into. There is no mystery as to the critical role each one of these defendants is

24

alleged to have played. The pleadings thus give ample "notice of what the . . . claim is and the grounds upon which it rests." Erickson, 127 S. Ct. at 2200 (quoting Twombly, 127 S. Ct. at 1964). Accordingly, except as noted below, plaintiffs may proceed on their Section 1981, 1982, and 1985(3) claims.

## II. Plaintiffs' Fair Housing Act Claims

Plaintiffs also contend that defendants violated the Fair Housing Act. Section 3604(b) of the Fair Housing Act prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." Section 3605(a) makes it unlawful for anyone "whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin." Fair Housing Act claims are evaluated under the familiar burden-shifting framework articulated in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir. 2003).

As an initial matter, the parties dispute the elements of a *prima facie* case of reverse redlining, such as is alleged in this case. In typical housing discrimination cases—involving the failure to rent or sell a property to a minority individual—plaintiffs must allege: "(1) that they are members of a protected class; (2) that they sought and were qualified to rent or purchase the housing; (3) that they were rejected; and (4) that the housing opportunity remained available to other renters or purchasers." Id. Plaintiffs generally may establish a Fair Housing Act violation

based on a theory of disparate treatment or on a theory of disparate impact. LeBlanc-Sternberg, 67 F.3d at 425.

In contrast to the typical failure-to-sell case, plaintiffs here allege that defendants engaged in the practice of reverse redlining, or the targeting of minorities and *only* minorities for sales on unfair terms. Although the Second Circuit has not yet held that reverse-redlining claims are cognizable under the Fair Housing Act, courts in other circuits have done so. See, e.g., Munoz v. Int'l Home Capital Corp., No. C 03-01099 RS, 2004 WL 3086907, at *4 (N.D. Cal. May 4, 2004); Matthews, 185 F. Supp. 2d at 885-87; Hargraves, 140 F. Supp. 2d at 20-22. These courts have held that the elements of a reverse-redlining claim are a variation on those that must be shown in a failure-to-sell case. In Matthews, a case involving a predatory lending scheme that allegedly targeted single, elderly women, the district court found that in order to establish a *prima facie* case of discrimination based on reverse redlining, a plaintiff must show:

> (1) that she is a member of a protected class; (2) that she applied for and was qualified for loans; (3) that the loans were given on grossly unfavorable terms; and (4) that the lender continues to provide loans to other applicants with similar qualifications, but on significantly more favorable terms. In the alternative, if the plaintiff presents direct evidence that the lender intentionally targeted her for unfair loans on the basis of sex and marital status, the plaintiff need not also show that the lender makes loans on more favorable terms to others. 185 F. Supp. 2d at 886-87 (internal citation omitted).

See also Munoz, 2004 WL 3086907, at *4 (applying the test enunciated in Matthews); Hargraves, 140 F. Supp. 2d at 20 ("In order to show a claim based on reverse redlining, the plaintiffs must show that the defendants' lending practices and loan terms were 'unfair' and

'predatory,' and that the defendants either intentionally targeted on the basis of race, or that there is a disparate impact on the basis of race.").

Defendants, in essence, contend that the fourth element of a reverse-redlining claim may *only* be established with evidence of disparate treatment or impact and not, as the Matthews court and others have held, with evidence of intentional targeting. In reverse-redlining cases, courts have justified allowing evidence of intentional targeting in lieu of evidence of disparate treatment or impact because to hold otherwise would allow predatory lending schemes to continue as long as they are exclusively perpetrated upon one racial group. See, e.g., id. (citing Contract Buyers League v. F & F Inv., 300 F. Supp. 210, 216 (N.D. Ill. 1969), for this proposition). Permitting evidence of intentional targeting as an alternative to evidence of disparate treatment or impact is also in keeping with the Fair Housing Act's twin aims of "forbidd[ing] those practices that make housing unavailable to persons on a discriminatory basis as well as discriminatory terms and conditions with respect to housing that *is* provided." Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 88 (2d Cir. 2000) (emphasis added); see also Orange Lake Assocs., Inc. v. Kirkpatrick, 21 F.3d 1214, 1227 (2d Cir. 1994) ("[H]ousing practices unlawful under Title VIII include not only those *motivated by a racially discriminatory purpose*, but also those that disproportionately affect minorities.") (citation omitted) (emphasis added)).

The only case cited by defendants in support of their contention that the fourth element of a reverse-redlining claim may be established only with evidence of disparate impact or treatment is Wiltshire, discussed above. Defendants make much of the fact that the Wiltshire court found

that the plaintiffs in that case could not proceed on a reverse-redlining claim under the Fair Housing Act because they had not made any allegations of disparate treatment. 421 F. Supp. 2d at 553-55. But defendants' attempt to draw support from Wiltshire is once again unavailing. As noted above, the Wiltshire plaintiffs, unlike the plaintiffs in this case, made no allegations of intentional targeting. Though the Wiltshire court found that plaintiffs had failed to allege evidence of disparate treatment, it did not hold that such evidence is the sole means of satisfying the fourth element of a reverse-redlining claim. Indeed, the Wiltshire court quoted at length from Matthews, including the passage from Matthews permitting the use of evidence of intentional targeting to sustain reverse-redlining claims. Id. at 554. However, since the Wiltshire plaintiffs did not offer a targeting theory, it is no surprise that the court did not explicitly adopt the Matthews test and its alternative formulation of the fourth element.

The Court joins the other district courts to have considered reverse-redlining claims premised on targeting allegations and holds that plaintiffs may establish the fourth prong of their *prima facie* case with evidence of intentional targeting. As discussed above, plaintiffs have offered specific allegations of intentional targeting that are sufficient to satisfy the fourth element.[2]

Defendant Alliance, alone, claims that plaintiffs have failed to allege the second and third elements of their reverse-redlining claims. Mem. Law Def. Alliance Mortgage Banking Corp.

---

[2]

Because the Court holds that plaintiffs have adequately pled their reverse-redlining claims with allegations of intentional targeting, it need not address whether plaintiffs have also stated reverse-redlining claims premised on theories of disparate treatment or impact.

Supp. Mot. Dismiss at 20-23. Alliance maintains that plaintiffs have failed to allege the second element—that they applied for and qualified for loans—because plaintiffs claim that they were coerced into signing mortgages on terms they ultimately could not afford. However, the Court does not read the second element to require that plaintiffs were qualified for the precise predatory loans that were the subject of the scam, but only that they applied for and were qualified for fairly administered loans. See Matthews, 185 F. Supp. 2d at 887 (finding that plaintiffs adequately alleged that they were qualified for loans, even though they could not afford the fraudulent loans that were the basis for their reverse-redlining claims). In this regard, plaintiffs each allege that they qualified for a "fairly priced" mortgage. Compl. ¶ 2. As to the third element—that the loans were administered on grossly unfavorable terms—plaintiffs allege that their mortgages "contained significantly unfavorable terms and conditions, particularly because [they were] based on a grossly inflated appraisal." Mathis Compl. ¶ 121; McDale Compl. ¶ 145; Washington Compl. ¶ 134.

The Court therefore concludes that plaintiffs have alleged sufficient facts to survive defendants' motions to dismiss their reverse-redlining claims.

III.  Statute of Limitations

Defendants allege that the Fair Housing Act claims of Mathis, the McDales, the Gibbonses, and Washington are time-barred by the Act's two-year statute of limitations. 42 U.S.C. § 3613(a). While plaintiffs concede that the four complaints were filed more than two years after the relevant homes were purchased, they contend that the complaints were nonetheless

timely because defendants committed a "continuing violation" of the Fair Housing Act and because the statute of limitations should be equitably tolled by defendants' fraudulent concealment.

The continuing violation doctrine applies when a plaintiff challenges "not just one incident of conduct violative of the [Fair Housing] Act, but an unlawful practice that continues into the limitations period . . . ." Havens Realty Corp. v. Coleman, 455 U.S. 363, 381 (1982). In Havens Realty, defendant was charged with violating the Fair Housing Act by refusing to rent apartments on the basis of race. The plaintiffs in the class action alleged several specific incidents of refusal to rent—only one of which occurred within 180 days (the then-applicable statute of limitations) of the filing of the complaint. The Supreme Court held that none of incidents was time-barred because the sales were made pursuant to a discriminatory practice. The Court held that "the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice." Id. at 381. Cf. Cornwell v. Robinson, 23 F.3d 694, 704 (2d Cir. 1994) (noting that "a continuing violation [of employment discrimination statutes] may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted . . . to continue unremedied for so long as to amount to a discriminatory policy or practice").

Plaintiffs here allege that defendants engaged in an unlawful practice of selling homes to minority homebuyers on unfair terms. Defendants contend that even if their behavior amounts to a discriminatory practice, the "last asserted occurrence of the practice" was when Washington

bought her home in January 2003, and thus that the Fair Housing Act claims in the fall 2005 complaints of Mathis, the McDales, the Gibbonses, and Washington are all untimely. Mem. Law Defs. United Homes, LLC, United Property Group, LLC, Galit Network, LLC, & Yaron Hershco Supp. Mot. Dismiss at 31 [hereinafter United Homes Mem. Law]. Plaintiffs argue that the "last asserted occurrence of the practice" was not a sale to one of the individual plaintiffs in this case, but occurred at the end of 2003 or sometime in 2004, since defendants continued to target other minorities for predatory sales after plaintiffs purchased their homes. Pls.' Consol. Mem. Law Opp'n Defs.' Mots. Dismiss at 32-34 [hereinafter Pls.' Mem. Law]. Plaintiffs base this timeline, at least in part, on their allegation that "[a] review of all 60 properties sold by United Homes entities during 2002 and 2003 reveals that all of the properties were sold in minority census tracts . . . and that they charged an average markup of over $160,000 for each property." Compl. ¶ 37. As currently pled, plaintiffs' complaints contain allegations that the alleged discriminatory practice persisted at least through the end of 2003. Cf. Fair Housing Council, Inc. v. Village of Olde St. Andrews, No. 05-5862, 2006 WL 3724128, at *9-13 (6th Cir. Dec. 15, 2006) (holding that continuing violation theory applied where developer allegedly engaged in an ongoing practice of designing and constructing housing units that were inaccessible to disabled individuals and that the statute of limitations tolled "until the sale of the last unit in that development") (unpublished opinion). At this relatively early stage in the litigation, such allegations are sufficient to withstand a motion to dismiss on timeliness grounds. Accordingly, defendants' motions to dismiss plaintiffs' Fair Housing Act claims as time-barred are denied.

Plaintiffs also contend that defendants' allegedly fraudulent behavior tolled the statute of limitations on their Fair Housing Act claims. The doctrine of fraudulent concealment may extend a statute of limitations if a plaintiff establishes:

> (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within [the applicable statutory period] of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part.

Cardiello v. The Money Store Inc., No. 00 Civ. 7332, 2001 U.S. Dist. LEXIS 7107, at *14-15 (S.D.N.Y. June 1, 2001) (quotation marks omitted). See also New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1083 (2d Cir. 1988) (discussing elements of fraudulent concealment doctrine). "The *sine qua non* of fraudulent concealment is that the defendant fraudulently concealed from the plaintiff his cause of action *during the time in which plaintiff could have brought that action.*" Cardiello, 2001 U.S. Dist. LEXIS 7107, at *15 (emphasis in original). The Second Circuit has made clear that pursuant to Federal Rule of Civil Procedure 9(b), plaintiffs must plead the elements of fraudulent concealment with specificity, Armstrong v. McAlpin, 699 F.2d 79, 90 (2d Cir. 1983), and submit "non-conclusory evidence of a conspiracy or other fraudulent wrong which precluded [the] possible discovery of the harms that [they] suffered," Pinaud v. County of Suffolk, 52 F.3d 1139, 1157 (2d Cir. 1995).

A plaintiff may prove the concealment element by showing either that the defendant took affirmative steps to prevent the plaintiff's discovery of his legal claim or that the defendant's wrongdoing was by its nature self-concealing. Hendrickson Bros., Inc., 840 F.2d at 1083. Plaintiffs allege that defendants' wrongdoing was self-concealing because they were steered to a

series of hand-picked attorneys and lenders, who pretended to represent their interests but instead were important players in the scheme. The act of employing ostensibly independent legal counsel as part of a predatory lending scam has been held to satisfy the concealment element by several district courts in this circuit. See Council v. Better Homes Depot, Inc., No. 04 CV 5620, 2006 U.S. Dist. LEXIS 57851, at *29 (E.D.N.Y. Aug. 16, 2006) (collecting cases).

As for the diligence element, plaintiffs concede they realized their homes were flawed shortly after moving in and that many of them brought these flaws to the attention of United Homes. See Gibbons Compl. ¶¶ 146-50; McDale Compl. ¶ 154; Washington Compl. ¶¶ 137-38. But while plaintiffs quickly realized they were on the receiving end of a defective product, "[t]here is a difference between being aware that you got a bad deal and being aware that you were discriminated against in a systematic fashion." Phillips v. Better Homes Depot, Inc., No. 02-CV-1168, 2003 U.S. Dist. LEXIS 27299, at *76-77 (E.D.N.Y. Nov. 12, 2003). Without meeting other United Homes clients or explaining their circumstances to an attorney who responsibly represented their interests, plaintiffs had no way of knowing exactly how and why they had been victimized.

However, even assuming plaintiffs have alleged the concealment and due diligence elements with sufficient specificity, the Court cannot conclude that equitable tolling applies in this instance, since plaintiffs do not identify the date or dates by which they knew about their Fair Housing Act claims. In predatory lending cases, courts typically deem plaintiffs to be aware of their claims as of the date on which they meet with counsel. Council, 2006 U.S. Dist. LEXIS

57851, at *32 (citing cases). Plaintiffs state in their memorandum of law that they "did not understand either the fraudulent conspiracy or the discriminatory nature of the scheme until meeting with their attorneys." Pls.' Mem. Law at 35. But nowhere in their complaints do they allege the dates of these meetings or any other date from which the Court could assess the timeliness of their claims. This apparent shortcoming will no doubt be addressed during discovery and, if necessary, re-presented to the Court in a more appropriate motion.

## C. Plaintiff Barkley's Truth in Lending Act Claim

Defendant Olympia contends that Barkley's claim under the Truth in Lending Act ("TILA") is barred by the Act's one-year statute of limitations. Plaintiffs failed to respond to Olympia's challenge to the timeliness of Barkley's TILA claim. A plaintiff is required to bring a TILA claim within one year of the "date of the occurrence of the violation." 15 U.S.C. § 1640(e). In cases involving "closed-end credit" transactions such as mortgages, the "occurrence of the violation" typically refers to the date on which a plaintiff enters into a loan agreement. Lewis v. Nissan N. Am., Inc., Corp., No. 04 Civ. 562, 2004 U.S. Dist. LEXIS 18742, at *9 (Sept. 17, 2004) (citing Boursiguot v. Citibank F.S.B., 323 F. Supp. 2d 350, 353 (D. Conn. 2004)); see also Cardiello, 2001 U.S. Dist. LEXIS 7107, at *11. Barkley signed her mortgage on January 14, 2003, yet she did not file her complaint until March 2, 2004, nearly 14 months later. Barkley Compl. ¶¶ 122, 127. Barkley's TILA claim thus is time-barred, and defendant Olympia's motion to dismiss this claim is granted.

## D. Plaintiffs' State and Local Race Discrimination Claims

Plaintiffs allege that defendants discriminated against them in violation of the New York State Human Rights Law ("NYSHRL") and the New York City Administrative Code. Because the standards relevant to these claims parallel those applicable under the Fair Housing Act, the Court declines to dismiss these claims. See Lynn v. Village of Pomona, No. 05-3955-cv, 2007 U.S. App. LEXIS 610, at *3 n.2 (2d Cir. Jan. 9, 2007) (summary order) (noting that housing discrimination claims brought under state and local law are typically analyzed under the same framework as claims brought under the Fair Housing Act) (citing Dawson v. Bumble & Bumble, 398 F.3d 211, 217 (2d Cir. 2005)).

## E. Plaintiffs' Other State-Law Claims

### I. Plaintiffs' Claims Under New York General Business Law § 349

Plaintiffs charge defendants with violating New York's consumer protection statute, Section 349 of the New York General Business Law. The elements of a Section 349 claim are: "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." Maurizio v. Goldsmith, 230 F.3d 518, 521 (2d Cir. 2000) (per curiam). The Second Circuit has held that "an action under § 349 is not subject to the pleading-with-particularity requirements of Rule 9(b) . . . but need only meet the bare-bones notice-pleading requirements of Rule 8(a)." Pelman v. McDonald's Corp., 396 F.3d 508, 511 (2d Cir. 2005) (internal citations omitted).

As a threshold matter, plaintiffs must charge defendants with conduct that is "consumer-

oriented," meaning "acts or practices that have a broader impact on consumers at large." Oswego

Laborers' Local 214 Pension Fund v. Marin Midland Bank, N.A., 85 N.Y.2d 20, 25 (1995).

Several defendants maintain that plaintiffs have failed to allege consumer-oriented conduct in

this case. While the sale of a home does not by itself constitute consumer-oriented conduct, the

New York Court of Appeals has held that Section 349 reaches real estate transactions consisting

of a "package of consumer services." Polonetsky v. Better Homes Depot, Inc., 97 N.Y.2d 46, 53

(2001). In Polonetsky, the New York Court of Appeals held that plaintiffs had alleged

consumer-oriented conduct where defendants "not only sold property, but allegedly orchestrated

a system of providing services under which prospective buyers were defrauded or misled every

step along the way . . . [and] allegedly steered buyers to mortgage bankers and attorneys who had

connections to Better Homes[.]" Id. at 53-54. Likewise plaintiffs here have alleged that

defendants orchestrated all-inclusive home sales and steered plaintiffs to participating lawyers,

lenders, and mortgage brokers. Accordingly, the alleged conduct is "consumer-oriented" for the

purposes of Section 349.

II. Plaintiffs' Fraud Claims

To state a claim of fraud under New York law, a plaintiff must allege "a representation of

material fact, the falsity of the representation, knowledge by the party making the representation

that it was false when made, justifiable reliance by the plaintiff and resulting injury." Lerner v.

Fleet Bank, N.A., 459 F.3d 273, 291 (2d Cir. 2006) (quoting Kaufman v. Cohen, 760 N.Y.S.2d

157, 165 (App. Div. 2003)). Federal Rule of Civil Procedure 9(b) provides a heightened

pleading standard for fraud: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Although under 9(b), "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally," the Second Circuit has stated that courts "must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations . . . . [P]laintiffs must allege facts that give rise to a strong inference of fraudulent intent." Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995) (quotation marks and citations omitted). Put differently, although matters peculiarly within a defendant's knowledge may be pled "on information and belief," these matters may not be pled "lacking any detail at all." First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159, 179 (2d Cir. 2004).

Several defendants maintain that plaintiffs have failed to establish reliance because New York follows the rule of *caveat emptor* in real estate transactions and requires a buyer to ascertain the value of property independently. However, courts have routinely found exceptions to this rule where sellers concealed facts or induced buyers to refrain from making independent inquiries into the terms of a real estate deal. See, e.g., Wilson v. Toussie, 260 F. Supp. 2d 530, 540 (E.D.N.Y. 2003) (noting that there are exceptions to the rule if "the misstatement of value was made in conjunction with a larger scheme or conspiracy to defraud"); Bethka v. Jensen, 672 N.Y.S.2d 494, 494-95 (App. Div. 1998) (noting that the rule does not apply where "some conduct . . . on the part of the seller rises to the level of 'active concealment'"). Further, some courts have declined to apply the rule of *caveat emptor* to bar fraud claims in cases with

allegations that defendants deliberately steered plaintiffs to other members of the conspiracy in order to prevent their discovery of the true value of the properties at issue. See, e.g., Banks v. Consumer Home Mortgage, Inc., No. 01-CV-8508, 2003 U.S. Dist. LEXIS 8230, at *30 (E.D.N.Y. Mar. 28, 2003) ("[I]t is clear that plaintiffs' allegations of steering . . . involve deliberate efforts to discourage plaintiffs from looking beyond the members of the alleged conspiracy for assistance."); Phillips, 2003 U.S. Dist. LEXIS 27299, at *47 ("If a jury finds that defendants intentionally steered Ms. Phillips to a lawyer, convinced her to trust them and that lawyer, and consciously led her down a false path of trust so as to profit from her ignorance, that is sufficient to establish reasonable reliance."). Plaintiffs allege that defendants not only steered them to other parties who were in on the fraud, but also pressured them into signing papers quickly, thereby discouraging them from obtaining independent advice about the terms of the transactions. If the fraud allegations, as pled, are substantiated, there is no credible authority that will insulate those responsible.

## F. Arguments Made By Individual Defendants

### I. Yaron Hershco

Yaron Hershco, the president of United Homes, argues that plaintiffs have failed to state claims against him for fraud and deceptive practices. Under New York law, corporate officers may be held liable for fraud only "if they participated in or had knowledge of the fraud, even if they did not stand to gain personally." Polonetsky, 97 N.Y.2d at 55. As noted above, Rule 9(b) allows states of mind to be "averred generally." The relaxation of Rule 9(b)'s specificity

requirement does not give plaintiffs a "license to base claims of fraud on speculation and conclusory allegations"; rather, plaintiffs must allege facts which "give rise to strong inference of fraudulent intent." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (quotation marks omitted). The requisite "strong inference" may be established either: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Lerner, 459 F.3d at 290-91 (quoting Shields, 25 F.3d at 1128). Facts that are peculiarly within the opposing party's knowledge may be pled on "information and belief" if "accompanied by a statement of the facts upon which the belief is based." Care Envtl. Corp. v. M2 Techs., Inc., No. CV-05-1600, 2006 U.S. Dist. LEXIS 2934, at *22-23 (E.D.N.Y. Jan. 18, 2006) (quoting DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987)).

Plaintiffs allege on "information and belief" that Hershco "owned and dominated" United Homes and its affiliated companies, Compl. ¶ 41, and signed the deeds to each of the homes purchased by plaintiffs. Id. ¶ 45. They also allege on "information and belief" that Hershco "conceived of and directed" the alleged scheme, id., and that the employees of United Homes acted "with the knowledge of and at the behest of Hershco and under his supervision," id. ¶ 46. As the president of United Homes, involved in the suspect transactions down to the level of signing each deed, Hershco stood to reap significant financial gain from the fraudulent sales and had both the motive and opportunity to commit fraud. Moreover, given that the complaints are

predicated on facts peculiarly within Hershco's knowledge, "it is difficult to imagine what facts plaintiffs could possibly possess as to [defendants'] knowledge and intent without having conducted discovery." Vaughn v. Consumer Home Mortgage, Inc., No. 01-CV-7937, 2003 U.S. Dist. LEXIS 8233, at *13 (E.D.N.Y. Mar. 28, 2003) (finding that allegations satisfied Rule 9(b) where corporate officers were, among other things, alleged to have "directed" and "had knowledge" of the fraudulent scheme).

Hershco also argues that plaintiffs have failed to state a claim against him for deceptive practices under Section 349 of the New York Business Law. As noted above, the Second Circuit has held that "an action under § 349 is not subject to the pleading-with-particularity requirements of Rule 9(b) . . . but need only meet the bare-bones notice-pleading requirements of Rule 8(a)." Pelman, 396 F.3d at 511 (internal citations omitted). Plaintiffs' allegations against Hershco meet the standards of Rule 8(a) and thus are sufficient to state a claim under Section 349.[3]

## II. Galit Network

Galit Network also moves to dismiss plaintiffs' state-law claims. Plaintiffs allege that Galit Network is one of a roster of related United Homes entities "owned and dominated" by Hershco that share the same principal place of business. Compl. ¶¶ 6-9, 44. Contrary to Galit Network's characterization of the complaints as "utterly devoid of any factual allegations"

---

[3]
      Plaintiffs also seek to proceed against Hershco under a veil-piercing theory. Because the determination of whether veil-piercing is appropriate is a "fact specific inquiry," MAG Portfolio Consult, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 63 (2d Cir. 2001), the Court declines to decide at this pre-discovery juncture whether plaintiffs may proceed on this theory.

against it, United Homes Mem. Law at 29, plaintiffs allege that Galit Network participated in key aspects of the fraudulent home sales. Galit Network was listed as the seller of several of the properties on various closing documents. Compl. ¶ 43; Lodge Compl. ¶ 148; Mathis Compl. ¶ 126; McDale Compl. ¶ 157; Gibbons Compl. ¶ 139. Moreover, Mathis alleges that Galit Network, LLC, is listed as the seller in the "Contract of Sale" and that he was told to make at least one of his down payment checks out to the entity, Mathis Compl. ¶ 126, indicating that Galit Network was a direct recipient of the fraudulent profits.

These allegations support the inference that Galit Network played a role in perpetuating the fraudulent scheme and are sufficient to withstand a motion to dismiss.

### III. Alliance Mortgage Banking Corporation

Alliance, the lender on the Mathis, McDale, and Washington properties, contends that plaintiffs have failed to state claims against it for fraud and deceptive practices. Plaintiffs allege that Alliance was intimately involved in all aspects of the fraud. According to plaintiffs, they "were pointedly directed, if not pushed, into the hands of Alliance by the United Homes entities . . . ." Mathis Compl. ¶ 50; McDale Compl. ¶ 50; Washington Compl. ¶ 50. Alliance allegedly aided in the scheme by conspiring with United Homes to arrange for the inflated appraisal of properties and then offering plaintiffs financing based on the bloated purchase prices of the homes. Mathis Compl. ¶ 51; McDale Compl. ¶ 51; Washington Compl. ¶ 51. In dealing with the McDales, the Alliance loan broker, Mr. Israel, allegedly told the couple that a "no doc," adjustable rate mortgage was the only way the sale could go through, and "made statements

41

suggesting that [he and Jerry] were doing the McDales a favor in getting the 'no doc' loan [for them] . . . ." McDale Compl. ¶¶ 123-124. Mr. Israel also instructed Mr. McDale to write a "shock letter" explaining how he would absorb the expense of the new mortgage. Id. ¶ 132. These allegations that Alliance knowingly induced plaintiffs to take out loans that were well beyond their economic means are sufficient to state claims for fraud and deceptive practices.

IV. Jospeh D. Gaeta

Joseph D. Gaeta, an appraiser on the Mathis and Washington transactions, contends that plaintiffs fail to state claims against him. The complaints contain comparatively few allegations against Gaeta. He is alleged to have provided "made-to-order" appraisals that significantly overstated the value of the subject properties. Mathis Compl. ¶¶ 72-73; Washington Compl. ¶¶ 72-73. Plaintiffs also allege on "information and belief" that Gaeta arrived at his inflated appraisal figures by employing tactics such as using other flipped properties as comparables and omitting the full sales history of the subject properties; they further allege that he overstated the value of the renovations to the Mathis property. Mathis Compl. ¶ 73. With regard to the fraud allegations, though plaintiffs do not specifically allege that they relied on Gaeta's appraisals, they surely did. Were it not for Gaeta's appraisals, United Homes and its preferred lenders would not have been able to secure the FHA insurance that allowed them to sell the homes to plaintiffs on seemingly attractive terms. Indeed, the inflated appraisals are the linchpin of the alleged fraud.

In support of his motion to dismiss the Mathis complaint, Gaeta has submitted a copy of

the Mathis appraisal itself.[4] Roth Aff. Ex. C. He points, for example, to the "Supplemental

Addendum" to the appraisal of the Mathis home, which contains the statement that the property

was in "need of extensive repair." Id. He also points to a "Notice to the Homebuyer" included in

the appraisal that enumerates problems with the property. Id. While it is true that some of these

disclosures appear to contradict plaintiffs' allegations that the appraisals were out-and-out

deceptive, the appraisal also appears to value the Mathis home by taking into account comparable

properties and recent renovations—the very techniques that plaintiffs contend served to inflate the

value of the property. Id. The Court concludes that Mathis has adequately alleged Gaeta's role in

the conspiracy and may proceed on his fraud claim and on his reverse-redlining claim under the

Fair Housing Act.

However, many of Mathis's other claims against Gaeta are time-barred. With the

exception of Mathis's fraud and Fair Housing Act claims, the statute of limitations on Mathis's

state and federal claims against Gaeta is three years. See Mian, 7 F.3d at 1087 (Sections 1981 and

1985); Lashley v. Seymour Orlofsky, Inc., No. 82 Civ. 0892, 1982 U.S. Dist. LEXIS 15112, at *4

(S.D.N.Y. Sept. 16, 1982) (Section 1982); Kassner v. 2nd Ave. Delicatessen Inc., No. 05-4237-cv,

2007 U.S. App. LEXIS 17523, at *10 (2d Cir. July 24, 2007) (NYSHRL and NYCHRL); N.Y.

C.P.L.R. § 214(2),(5) (Section 349 and negligence). Gaeta claims that the limitations period

---

4

    Since Mathis explicitly relied on Gaeta's appraisal in his complaint, see Mathis Compl.
¶¶ 70-75, the Court may consider the document on a motion to dismiss without converting the
motion into one for summary judgment. See Roth, 2007 U.S. App. LEXIS 13035, at *26-28
(noting that the principle that certain documents outside the pleadings may be considered on a
motion to dismiss has "its greatest applicability in cases alleging fraud").

began on September 11, 2002, the alleged date of his appraisal. Gaeta Mem. Law at 8. Without addressing the timeliness of Mathis's other claims against Gaeta, plaintiffs contend in a footnote that the Section 349 claim is not time-barred because the statute should run from a later date during the month of September 2002. Pls.' Mem. Law at 37 n.22. Regardless of what date in September the Court looks to, the claims are still time-barred, since Mathis's original complaint filed on September 16, 2005, did not name Gaeta, but instead named "John Doe 1." Mathis Compl. ¶ 16 (filed September 16, 2005). Nor does the December 6, 2005 complaint naming Gaeta relate back to the original. Under Federal Rule of Civil Procedure 15(c), an amended complaint relates back to the original when a plaintiff's failure to name a defendant is attributable to a "mistake concerning the identity of the proper party." Fed. R. Civ. P. 15(c)(3)(B). The Second Circuit has stated that a plaintiff is not considered to have made such a mistake when "newly-added defendants were not named originally because the plaintiff did not know their identities." Barrow v. Wethersfield Police Dep't, 66 F.3d 466, 470 (2d Cir. 1995), modified, 74 F.3d 1366 (2d Cir. 1996) (per curiam). Here, Mathis's original complaint stated that "John Doe 1" was the "fictitious name of the property appraiser" and that it was his "intention to promptly amend his complaint after discovery of the name of this individual." Mathis Compl. ¶ 16 (filed September 16, 2005). Since Mathis failed to name Gaeta because he did not know the identity of the appraiser on his property, the relation-back requirements are not met and Gaeta's motion to dismiss is granted with respect to all but Mathis's fraud and Fair Housing Act claims.

With regard to the Washington complaint, Gaeta has attached a copy of what he terms a

"Comparable Review" he allegedly performed on the Washington property. Gaeta Mem. Law at 5, 27-28; Roth Aff. Ex. F. Because the provenance of this document is unknown, and Washington does not explicitly rely on it in her complaint, the Court declines to consider it on a motion to dismiss. The Court concludes that Washington, too, has adequately pled claims against Gaeta.

### V. Marios Sfantos

Sfantos, an attorney on the Mathis and Gibbons transactions, moves to dismiss the state-law claims against him. Plaintiffs allege that Sfantos was part of the "readily-available stable of attorneys" to whom United Homes referred plaintiffs, Compl. ¶ 80, and, like the other attorneys, was loyal to United Homes, thus ensuring that his clients did not "receive independent and sound legal advice," id. According to the complaints, Sfantos and the other attorneys breached their professional duty by, among other things, not protecting their clients' interests, rushing through transactions, not giving plaintiffs proper disclosures, and failing to point out obvious problems with the proposed mortgages. Id. ¶ 81. Mathis alleges that a United Homes salesman and his manager informed him that the company "would provide an attorney" for him, and that Mathis met Sfantos for the first time at the signing of the sales contract at the United Homes offices. Mathis Compl. ¶ 116. The Gibbonses likewise allege that a United Homes employee told them that the company had a lawyer to represent them and introduced them to Sfantos, "who was at the United Homes' office." Gibbons Compl. ¶ 116.

Contrary to Sfantos' assertion that plaintiffs are proceeding on a "groundless and fanciful theory," Sfantos Mem. Law Supp. Mot. Dismiss at 1, the Court finds that plaintiffs' allegations

against Sfantos are well-articulated and sufficient to withstand the motion to dismiss. Like the other attorneys named in the complaints, Sfantos is alleged to have been conveniently present at the United Homes offices when plaintiffs needed an attorney. Once the client hand-off transpired, Sfantos is alleged to have played a particularly insidious role in the conspiracy by obscuring the true terms of the transaction and cleverly deflecting any inclination plaintiffs may have had to secure independent valuations of the properties. In particular, with regard to the Gibbonses, Sfantos is alleged to have presided over a transaction that left the couple with two mortgages with monthly payments totaling $2413.69—at a time when their net income was only $2500. Gibbons Compl. ¶¶ 114, 129-30. Sfantos' motion to dismiss is denied.[5]

## VI. Michael Masciale

Michael Masciale, an appraiser named in the McDale and Washington complaints, seeks dismissal of plaintiffs' complaints with regard to him, claiming that he is not a proper party to the lawsuit. He contends that a corporation, Masciale & Associates, Inc., was retained to conduct the allegedly fraudulent appraisals and that an individual named Donna Kianka actually performed them. Masciale Mem. Law at 12-13. This argument must fail, because it involves questions of fact inappropriate for consideration on a motion to dismiss. Plaintiffs may proceed with their claims against Masciale.

---

[5]
  The Court notes that Sfantos has attached a series of documents to his motion to dismiss. Though these documents may be relevant to a motion for summary judgment, the Court declines to consider them on a motion to dismiss.

## CONCLUSION

It is important to emphasize that the Court assumes, as it must, the truthfulness of plaintiffs' allegations in concluding that the case must move forward through discovery. It remains to be seen whether any or all of the claims will survive greater scrutiny. For the moment, given both the general and specific allegations in the pleadings, it should be acknowledged that even the most casual reading would leave no one in doubt of what is being alleged. As to each category of defendant—the United Homes entities, appraisers, lawyers, and lenders—all know what is alleged against them and why. And the highly interdependent nature of the alleged scheme underscores the contribution of each defendant to the conspiratorial endeavor. Moreover, at this juncture, it cannot be said that the plaintiffs' fundamental accusation that racial considerations drove the conspiratorial engines is unsupported by the pleadings.

Accordingly, the Court grants Olympia's motion to dismiss Barkley's Truth in Lending Act claim and grants Gaeta's motion to dismiss all of Mathis's claims against Gaeta except for Mathis's fraud and Fair Housing Act claims. Defendants' other motions are denied.[6]

SO ORDERED.

Dated: Brooklyn, New York
     August 22, 2007

s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge

---

[6]
    In light of the above disposition, the Rule 19 parties will remain in the case.